# 14-4221-cv

## United States Court of Appeals
### for the
### Second Circuit

D.C.A. GRANTOR TRUST, GIOVANNI CARLOTTA, RAIMONDO IALLONARDO,

*Plaintiffs-Appellants,*

PEDRO KALBERMANN, BANK OF NEW YORK MELLON,

*Plaintiffs,*

ALLEN,

*Plaintiff-Counter-Defendant,*

−v. −

THE REPUBLIC OF ARGENTINA,

*Defendant-Counter-Claimant - Appellee,*

ADMINISTRACION NACIONAL DE SEGURIDAD SOCIAL,

*Defendant.*

*(Caption Continued on Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

*Of Counsel:*
Anthony J. Costantini
Suzan Jo

DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiffs-Appellants*

VALERIO PIACENZA, MILENA AMPALLA, ANTONELLA BACCHIOCCHI, FILIPPO BAGOLIN, GIANCARLO BARTOLOMEI CORSI, ANNELIESE GUNDA BECKER, GIORGIO BENNATI, CARLA MORATA, ORSOLINA BERRA, EUGENIA RE, STEFANO BISTAGNINO, FELICINA GAIOLI, ANDREA BONAZZI, LUCA VITALI, STEFANIA BONPENSIERE, MARCELLO CALANCA, ELETTRA CASALINI, BRUNO CALMASINI, TARCISIA DALBOSCO, ITALIA CAMATO, VINCENZO CARBONE, MARCO CAVALLI, VALERIA TOSO, CARMELINA CENSI, GIAN FRANCESCO CERCATO, BARBARA RICCHI, SILVANA CORATO, GIULIA GREGGIO, FRANCESCO CORSO, GIUSEPPINA CORSO, LAURA COSCI, ALDO DAVID, ANTONIO DE FRANCESCO, FRANCESCO FOGGIATO, RINALDO FRISINGHELLI, GRAZIELLA DACROCE, ANGIOLINO FUSATO, GABRIELE FUSATO, ANNA STORCHI, MADDALENA GAIOLI, FRANCESCO MAURO GHEZZI, MARIA LUIGIA CONTI, GIANFRANCO GUARINI, INNOVAMEDICA S.P.A., FKA MATIVA S.R.I., ANGELO LEONI, RACHELE BONTEMPI, CARMELO MAIO, CLAUDIO MANGANO, MARITZA LENTI, ROMANO MARTON, MIRCO MASINA, GUGLIELMINA MASSARA, MARTINO VERNA, ALESSANDRO MORATA, MARIA RITA MORETTO, UGO LORENZI, BRUNO PAPPACODA, LUISELLA GUARDINCERRI, ADRIANO ROSATO, SANTE STEFANI, ANGELINA SALMISTRARO, STUDIO LEGALE BENNATI, RENATE TIELMAN, MANUELITO TOSO, MAURO TOSO, MARIO VICINI, GIUSEPPINA CAPEZZERA, GRAZIELLA BONADIMAN, SALVATORE MELCHIONDA, FRANCO PEZZE, TIZIANO SASSELLI, GIOVANNA FERRO, RENATA BOSCARIOL, GIAMPAOLO MONTINO, MAURIZIO SERGI, SIMONA STACCIOLI, AUGUSTO ARCANGELI DE FELICIS, ALBERTO COMPARE, MANUELA DE ROSA KUNDERFRANCO, GIOVANNA CONNENA, ANTONELLA DE ROSA KUNDERFRANCO, ADRIANA DELL'ERA, GIAN CARLO GANAPINI, LAURA ANNA CAPURRO, FERNANDA ANGELA LOVERO, SABRINA PARODI, PAOLA ROSA, LICIA STAMPFLI-ROSA, AGOSTINO CONSOLINI, CESARINO CONSOLINI, MARIO GIACOMETTI, VERNA GUALANDI, HILDA RUPPRECHT, GIANFRANCO AGOSTINI, SARA BARTOLOZZI, ROBERTO BERARDOCCO, CARLO BRETTI, SUSANNA BRETTI, ANNA FERRI, GIOVANNI GIARDINA, VINCENZA SABATELLI, MARIA ROBBIATI, ANGELO COTTONI, BRUNA MATTIOLI, ALLESSANDRA REGOLI, SILVIA REGOLI, INES ROTA, VITO ZANCANER, MATTEO ZANICHELLI, GIOVANNI ZANICHELLI, MASSIMO BETTONI, CARLA MARINI ARCANGELI DE FELICIS, CARIFIN S.A., DIEGO CASTAGNA, EUFROSINA DE STEFANO, GRAZIANO ADAMI, MONICA CROZZOLETTO, CELESTINO GOGLIA, PAOLO LISI, ELIDE MARGNELLI, AMATO MORI, RUGGERO ROSSINI, ANTONIETTA GUISEPPINA BRIOSCHI, RAFFAELE ROSSINI, SIMONETTA MONTANARI, CLAUDIO MORI, ALFREDO PELLI, GRAZIELLA BERCHI, GIUSEPPE SILVIO ROSSINI, MARINELLA SCALVI, LAURA ROSSINI, ADRIANO BETTINELLI, SERGIO LOVATI, ALBERTO BACIUCCO, OTELLO BACIUCCO, EMANUELE BOTTI, GIOVANNI BOTTI, MARIA ZILIANI, CARLO FARIOLI, PIER LUIGI LUCIBELLO PIANI, FRANCO TRENTIN, STEFANIA TRENTIN, MARCO BORGRA, SERGIO BORGRA, DONATELLA FRAGONARA ZANOTTI,

*Plaintiffs-Appellants (cont'd)*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF AUTHORITIES ................................................................................iv

PRELIMINARY STATEMENT ......................................................................... 1

JURISDICTIONAL STATEMENT .................................................................... 4

ISSUES PRESENTED FOR REVIEW ............................................................... 5

STATEMENT OF THE CASE ............................................................................ 6

STATEMENT OF FACTS ................................................................................... 8

SUMMARY OF ARGUMENT ......................................................................... 13

STATEMENT OF THE STANDARD OF REVIEW ........................................ 16

ARGUMENT ..................................................................................................... 17

I.      Rule 69(a) of the FRCP and Section 5255(b) of the CPLR Mandate Turnover of the Funds ...................................................................... 17

        A.      Section 5225(b) of the CPLR May Be Utilized by Plaintiffs-Appellants in Aid of Enforcing Their Judgments Against the Republic ................................................................................... 17

        B.      Section 5225(b) Applies Regardless of Whether the Republic has an Interest in the Funds ..................................................... 18

        C.      Section 5225(b) Applies Even if the Republic Maintained an Interest in the Funds ................................................................ 21

        D.      Section 5225(b) Applies to Property Located Overseas ................... 22

II.     The FSIA Does Not Bar the Turnover of the Funds .................................... 24

        A.      The FSIA Simply Does Not Apply if the Republic No Longer Has a Property Interest in the Funds. ................................. 24

B.    If the Republic has a Continuing Property Interest in the Funds, the FSIA Does Not Apply Because the Funds are Located outside the United States ....................................................................26

    (a)    Legislative Overview of the FSIA ............................................26

    (b)    The FSIA Does Not Prohibit Post-Judgment Collection Efforts Against Sovereign Assets Located Outside the United States ............................................................................30

C.    If the Funds are Deemed to be Located in the U.S., the Execution Immunity Exception of § 1610(a)(1) to the FSIA Would Apply ......................................................................................33

III.    Rules of International Comity Do Not Bar Post Judgment Extra-Territorial Collection Efforts Against the Republic .....................................38

CONCLUSION ........................................................................................44

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel states that there are no corporate parents, affiliates and/or subsidiaries of said parties which are publicly held, or which own more than a 10% interest therein.

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*Abuhamda v. Abuhamda*
  236 A.D.2d 290, 654 N.Y.S.2d 11 (1st Dep't 1997)....................................23

*Anglo–Iberia Underwriting Mgmt. v. P.T. Jamsostek*
  600 F.3d 171 (2d Cir. 2010) ...........................................................36

*Aurelius Capital Master, Ltd. v. Republic of Argentina*
  No. 14-2689 (2d Cir. Sept. 18, 2014) ...........................................41

*Calton v. Pressler & Pressler, LLP*
  No. 10 Civ. 2117(LMM), 2011 WL 10901795
  (S.D.N.Y. Aug. 23, 2011)...............................................................23

*Capital Ventures Intern. v. Republic of Argentina*
  443 F.3d 214 (2d Cir. 2006) ..........................................................22

*Capital Ventures Intern. v. Republic of Argentina*
  652 F.3d 266 (2d Cir. 2011) ..........................................................22

*Cardew v. Gialanella*
  92 A.D.3d 1002, 937 N.Y.S.2d 709 (3d Dep't. 2012) .................................18

*China Trade & Dev. Corp. v. M.V. Choong Yong*
  837 F.2d 33 (2d Cir.1987) .............................................................42

*CIMC Raffles Offshore (Singapore) Pte. Ltd. v. Schahin Holding S.A.*
  No. 13 Civ. 52(JSR), 2013 WL 4082973 (S.D.N.Y. Aug. 6, 2013) .............24

*Cohen v. Beneficial Indus. Loan Corp.*
  337 U.S. 541 (1949)......................................................................5

*Dulce v. Dulce*
  233 F.3d 143 (2d Cir. 2000) ............................................................4

*EM Ltd. v. Republic of Argentina*
  473 F.3d 463 (2d Cir. 2007) ............................................................8

*EM Ltd. v. Republic of Argentina*
  695 F.3d 201 (2d Cir. 2012) ..................................................... 4, 30-31

*Epperson v. Entm't Express, Inc.*
242 F.3d 100 (2d Cir. 2001) ...........................................................4

*First City, Texas Houston, N.A. v. Rafidain Bank*
281 F.3d 48 (2d Cir. 2002) ...........................................................37

*Glenmore Distilleries Co. v. Seideman*
267 F. Supp. 915 (E.D.N.Y. 1967) ................................................34

*Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*
41 A.D.3d 25, 836 N.Y.S.2d 4 (1st Dep't 2007), *lv. denied,*
10 N.Y.3d 705 (N.Y. 2008) ...........................................................23

*Gucci Am., Inc. v. Weixing Li*
768 F.3d 122 (2d Cir. 2014) ..........................................................42

*Holder v. Humanitarian Law Project*
561 U.S. 1 (2010)...........................................................................30

*Hotel 71 Mezz Lender, LLC v. Rosenblatt*
64 A.D.3d 431, 883 N.Y.S.2d 30 (1st Dep't 2009)......................19

*Ivor B. Clark Co. v. Hogan*
296 F. Supp. 398 (S.D.N.Y. 1968), *order modified*, 296 F. Supp. 407
(S.D.N.Y. 1969).............................................................................34

*JW Oilfield Equip., LLC v. Commerzbank, AG*
764 F. Supp. 2d 587 (S.D.N.Y. 2011) ....................................23, 43

*Koehler v. Bank of Bermuda Ltd.*
544 F.3d 78 (2d Cir. 2008) ............................................................23

*Koehler v. Bank of Bermuda Ltd.*
883 N.Y.S.2d 763, 911 N.E.2d 825 (N.Y. 2009) ............. 22-23, 40

*Laker Airways Ltd. v. Sabena*
731 F.2d 909 (D.C. Cir. 1984)........................................................42

*Local Loan Co. v. Hunt*
292 U.S. 234 (1934)........................................................................34

*Lora v. O'Heaney*
602 F.3d 106 (2d Cir. 2010) ............................................................4

*Marie Laurette Dussault v. The Republic of Argentina*
No. 06-CV-13085-TPG (S.D.N.Y. 2014).....................................................12

*Miller v. Doniger*
28 A.D.3d 405, 814 N.Y.S.2d 141 (1st Dep't 2006)..............................19, 23

*Milner v. Dep't of the Navy*
131 S. Ct. 1259 (2011)................................................................................30

*Mortimer Off Shore Services, Ltd. v. Federal Republic of Germany*
615 F.3d 97 (2d Cir. 2010) .........................................................................37

*Motorola Credit Corp. v. Uzan*
388 F.3d 39 (2d Cir. 2004) .........................................................................42

*NML Capital, Ltd. v. Republic of Argentina*
1:08-cv-06978-TPG (S.D.N.Y. Feb. 23, 2012), ECF No. 371 .......................9

*NML Capital, Ltd. v. The Republic of Argentina*
1:08-cv-06978-TPG (S.D.N.Y. Oct. 3, 2014), ECF No. 693 .......................22

*NML Capital, Ltd. v. Republic of Argentina*
680 F.3d 254 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 273 (2012) ...............36

*NML Capital, Ltd. v. Republic of Argentina*
699 F.3d 246 (2d Cir. 2012) ....................................................................9, 39

*NML Capital, Ltd. v. Republic of Argentina*
727 F.3d 230 (2d Cir. 2013) .......................................................................10

*NML Capital, Ltd. v. Republic of Argentina*
No. 08 Civ. 6978 TPG, 09 Civ. 1707 TPG, 09 Civ. 1708 TPG,
2011 WL 9522565 (S.D.N.Y. Dec. 07, 2011)................................................9

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*
472 F.3d 33 (2d Cir. 2006) .........................................................................16

*Republic of Argentina v. NML Capital, Ltd.*
134 S. Ct. 2250 (2014)........................................................................passim

*Republic of Argentina v. NML Capital, Ltd.*
134 S. Ct. 2819 (2014).................................................................................10

*Republic of Argentina v. Weltover*
    504 U.S. 607 (1992) ...................................................................36

*S.E.C. v. Softpoint, Inc.*
    No. 95 Civ. 2951, 2012 WL 1681167 (S.D.N.Y. May 9, 2012) ..................24

*S.E.C. v. Colonial Inv. Mngt. LLC,*
    No. 07 Civ. 8849, 2010 WL 4159276 (S.D.N.Y. Oct. 6, 2011) ..................17

*Samuels v. Samuels*
    99 A.D.2d 986, 473 N.Y.S.2d 436–37 (1st Dep't 1984*)*................................18

*Siemens and Halske GmbH v. Gres*
    32 A.D.2d 624, 299 N.Y.S.2d 908 (1st Dep't 1969)....................................19

*Societe Internationale v. Rogers*
    357 U.S. 197 (1958)....................................................................42

*Starbare II Partners, L.P. v. Sloan*
    216 A.D.2d 238, 629 N.Y.S.2d 23 (1st Dep't 1995)....................................23

*Vasilas Bacolitsas v. 86th & 3rd Owner, LLC.,*
    702 F.3d 673 (2d Cir. 2012) ...........................................................3

*World Holdings, LLC v. Federal Republic of Germany*
    613 F.3d 1310 (11th Cir. 2010) ......................................................37

*Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*
    No. 10 Civ. 6147(PAC), 2014 WL 81563 (S.D.N.Y. Jan. 9, 2014).............23

*Zeiler v. Deitsch*
    500 F.3d 157 (2d Cir. 2007) ...........................................................4

**STATUTES**

28 U.S.C. § 1291 .............................................................................4

28 U.S.C. § 1330 .............................................................................4

28 U.S.C. § 1602...........................................................................27, 31

28 U.S.C. § 1603..............................................................................27

vii

28 U.S.C. § 1604 ................................................................28

28 U.S.C. § 1605 .............................................................4, 28

28 U.S.C. § 1606 ...........................................................28, 40

28 U.S.C. § 1609 ..........................................................passim

28 U.S.C. § 1610 ..........................................................passim

28 U.S.C. § 1611 ...........................................................29, 32

CPLR § 5225 ................................................................passim

## OTHER AUTHORITIES

11 Jack B. WEINSTEIN ET AL., NEW YORK CIVIL PRACTICE ¶ 5225.02 (2d ed.).......18

Brent McKnight, *How Shall We Then Reason – The Historical
    Setting of Equity*, 45 Mercer L. Rev. 919, 927-35 (1994) ............................34

*Argentina tells bondholders to take action against Judge Gresa who is
    'withholding funds'*, MERCOPRESS, Oct. 30, 2014 .........................................11

FED. R. CIV. P. 69 ..........................................................passim

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW ..................................42

## PRELIMINARY STATEMENT

This appeal concerns $539 Million in Funds ("Funds") that were transferred from the Republic of Argentina ("Republic") to Bank of New York Mellon ("BNY Mellon") in violation of an injunction imposed by the District Court and affirmed by this Court.  The Republic made this transfer so that it could argue, both from a legal and public relations standpoint, that it was not in default on its obligations to the majority of its Bondholders who had exchanged defaulted bonds for performing bonds at deep discounts in exchange offers that took place in 2005 and 2010 ("Exchange Bondholders").  Those exchanges have been ruled illegal by this Court.  When the Republic's attempt to forcibly override the injunction failed, the District Court froze the Funds at BNY Mellon until further notice, and did not order the Funds returned to the Republic.  Plaintiffs-Appellants here, who are judgment creditors of the Republic, properly sought turnover of the Funds under New York Law.

In the District Court, the Republic, in a misguided attempt to defuse a turnover proceeding authorized by § 5225(b) of the New York Civil Practice Law and Rules ("CPLR"), first disclaimed an interest in the Funds and then alternatively argued that they were immune from turnover under the Foreign Sovereign Immunities Act ("FSIA").  The District Court ignored the disclaimer (which would have rendered the FSIA irrelevant) and instead ruled that the FSIA

barred a turnover of the Funds because the Funds were physically located outside the United States and the FSIA did not authorize a turnover of funds located outside the United States.

This conclusion turns the statute on its head: the FSIA itself expressly limits the scope of its execution immunity (and any exceptions thereto) to "property *in* the United States of a foreign state." 28 U.S.C. § 1609 (emphasis added). It is also contrary to the reasoning of the Supreme Court of the United States in *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2257 (2014), wherein the Supreme Court held, with respect to discovery aimed at identifying and locating sovereign assets held outside the United States by New York-based banks, that the discovery in question did not need FSIA authorization because the discovery was *not* subject to the FSIA since the assets in question were not "property in the United States of a foreign state."

If, contrary to the District Court's analysis, the Funds are deemed to be "property in the United States" because they are controlled by a New York resident (*i.e.*, BNY Mellon), and assuming further that 28 U.S.C. § 1609 execution immunity would apply, it is clear that the Funds are nonetheless within the execution immunity exception of 28 U.S.C. § 1610 of the FSIA. As could be easily gleaned from the Republic's instructions to the transferee, the Funds were to be "used for a commercial activity in the United States" - - the payment of interest

2

to a group of Bondholders who attained their position through transactions which this Court has determined to be illegal acts. Additionally, it is equally clear that the Republic has waived its execution immunity in the broadest possible language with specific reference to post-judgment relief under the FSIA.

Although the District Court did not address whether the turnover proceeding was compliant with CPLR § 5225(b), Plaintiffs-Appellants respectfully submit that judgment creditors have a far superior claim to the Funds than the transferee - - the sole remaining question under the Rule. Assuming that courts have any discretion with respect to the application of § 5225(b), which is written in mandatory terms, no one opposing the turnover has pointed to any legitimate reason as to why such a turnover, which is otherwise consistent with New York law, should not be ordered. Consequently, this Court should both order reversal and mandate the turnover of the Funds. *See, e.g., Vasilas Bacolitsas v. 86th & 3rd Owner, LLC.*, 702 F.3d 673, 681 (2d Cir. 2012) (this Court has "discretion to consider issues that were raised, briefed, and argued in the District Court but that were not reached there.").

# JURISDICTIONAL STATEMENT

The District Court originally had jurisdiction over these actions pursuant to 28 U.S.C. § 1605(a)(l) and 28 U.S.C. § 1330 because the Republic is a foreign sovereign that has waived its immunity with respect to actions to collect on the Republic's bonds owned by Plaintiffs-Appellants.  Judgments have been entered, and the District Court had ancillary jurisdiction to enforce its judgments.  *See*, *e.g.*, *Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) (citing *Dulce v. Dulce*, 233 F.3d 143, 146 (2d Cir. 2000)); *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001).

Plaintiffs-Appellants filed a timely notice of appeal on November 6, 2014 from the District Court's October 27th order denying their motion for a turnover order.  A6.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 based on the collateral order doctrine whereby a decision is considered "final" if it "(1) conclusively determines a disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from final judgment."  *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 205 (2d Cir. 2012) (citing *Lora v. O'Heaney*, 602 F.3d 106, 111 (2d Cir. 2010)) (finding a discovery order to be a "final decision" within the context of supplemental post-judgment proceedings to facilitate execution of a judgment

4

against the Republic); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (enumerating same three requirements).

Here, the District Court's October 27, 2014 Order denying Plaintiffs-Appellants' motion for turnover of the Funds held by BNY Mellon satisfies all three elements of the collateral order doctrine. *See* A516. First, the District Court conclusively held that Plaintiffs-Appellants' motion for turnover was denied because turnover of the Funds was prohibited by the FSIA. A521-22. Second, the District Court's Order is completely separate from the merits of the underlying action, which is long-since over. In the Order, the District Court does not dispute the fact that Plaintiffs-Appellants are judgment creditors of the Republic. A516-22. Rather, the District Court's determination turns on its interpretation of the supposedly preclusive effects of the FSIA. A521-22. Third, the issue of whether turnover of the Funds held by BNY Mellon was mandated despite the FSIA was unreviewable on appeal from the final judgments in the underlying actions because the Funds were not transferred to BNY Mellon until long after the time to appeal the judgments had expired; there is no other avenue of appeal. A24-28 at ¶¶ 8-28.

## ISSUES PRESENTED FOR REVIEW

1.  Should the District Court have made a determination as to whether the Republic had a property interest in the Funds held by BNY Mellon, given the

5

Republic's disclaimer, before addressing any FSIA question since the FSIA has no application to the Funds if the foreign sovereign has no property interest?

2.    Assuming the Republic has a property interest in the Funds despite its disclaimer, does the FSIA bar a district court from issuing an order requiring the turnover of Funds held outside the United States by a transferee subject to the personal jurisdiction of the court?

3.    Assuming instead that the Funds in question are deemed to be located in the United States, does the FSIA's execution immunity apply at all?

4.    Does any other factor prevent the District Court from applying CPLR § 5225(b), which is mandatory in its terms?

## STATEMENT OF THE CASE

Plaintiffs-Appellants hold judgments issued by the United States District Court for the Southern District of New York (the "District Court") in various actions brought against the Republic.  *See* A24-28 at ¶¶ 8-28.  On August 7, 2014, Plaintiffs-Appellants filed a motion for a turnover order pursuant to CPLR § 5225(b) against BNY Mellon in order to obtain the turnover of the Funds held by BNY Mellon as garnishee.  A13-18.  The Funds had been transferred to BNY Mellon by the Republic for the purpose of making interest payments to certain Exchange Bondholders in a transparent attempt to at least appear to "avoid" a default.  However, because of injunctions issued by the District Court, which were

6

affirmed by this Court, and on which the Supreme Court declined to grant

*certiorari*, the Funds were not paid out to the Exchange Bondholders and were

ordered to be held by BNY Mellon in a BNY Mellon account in Argentina.  A52-

55.  BNY Mellon, the Republic and a group of Exchange Bondholders who held

bonds denominated in Euros (the "Euro Bondholders") opposed Plaintiffs-

Appellants' motion for a turnover.  In its court filings opposing the application of §

5225(b), the Republic, with the support of the other opponents, tactically

disclaimed any property interest in the Funds and mistakenly argued that the

disclaimer rendered § 5225(b) inapplicable.  A457.

On October 27, 2014, the District Court entered an Order denying Plaintiffs-

Appellants' motion for a turnover order against BNY Mellon, holding that the

Funds at issue are located outside the United States and that the FSIA does not

authorize attachment or execution of foreign sovereign property located outside the

United States.  A516-22.  Putting aside the Republic's disclaimer of any interest in

the Funds, the fundamental issue here is whether the FSIA acts to bar the recovery

sought by Plaintiffs-Appellants.  It does not.  The District Court recognized that the

FSIA did not have provisions that apply to the facts present - funds on deposit

outside the U.S.  A521.  The problem and error is with the next step of the District

Court's analysis: the court found that because the FSIA didn't address this situation,

no relief was possible, in substance finding that the FSIA preempts in situations

7

that the FSIA expressly does not address.  A521-22.  This was plain error for the reasons set forth below.

## STATEMENT OF FACTS

Almost all the moving Plaintiffs-Appellants are Italian citizens who purchased bonds issued by the Republic and later obtained judgments against the Republic for its failure to pay principal and interest on the bonds ("Plaintiffs-Appellants" or the "Italian Judgment Creditors").  *See* A23 ¶ 2.  Far from being so-called "vulture funds"—the group of bondholders frequently demonized by the Republic for purchasing their bonds at deep discounts on the secondary market—the Italian Judgment Creditors purchased their bonds at the time of issue and at par value, hoping to benefit from their investment through interest payments and, upon maturity, full repayment of principal.  *Id.* ¶ 3.  The Italian Judgment Creditors did not purchase their bonds as bets or hedges, but as "secure" investments to fund their retirements.  A24 ¶ 4.

In 2001, the Republic repudiated its obligations on the bonds and the Italian Judgment Creditors have not received any payments on the bonds since.  *Id.* ¶ 5.[1]  As a result, the Italian Judgment Creditors were forced to file actions against the Republic and to seek judgments against the Republic, which the District Court

---

[1] A full history of the Republic's defaults on sovereign debt is set forth in this Court's opinion in *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007).

subsequently granted.  A24-28 ¶¶ 7-28.  The Republic has steadfastly frustrated

any attempt made by the Italian Judgment Creditors to collect on those judgments.

A28 ¶ 29.

In both 2005 and 2010, the Republic offered, in solicitations made in the

United States pursuant to U.S. securities laws, to exchange new bonds, of a lesser

value, to its existing bondholders, and 92% of them accepted (the "Exchange

Bondholders"). [2]   The legality of these exchanges was challenged by a group of

holdover bondholders, and the District Court found that the exchanges violated the

*pari passu* clause of the original Agreement which promised equal treatment to all

bondholders who came within the terms of the clause.  *NML Capital, Ltd. v.

Republic of Argentina*, No. 08 Civ. 6978 TPG, 09 Civ. 1707 TPG, 09 Civ. 1708

TPG, 2011 WL 9522565 (S.D.N.Y. Dec. 07, 2011).  The court below further held

that no further payments should be paid to Exchange Bondholders unless and until

the other bondholders received a "ratable payment."  Order, *NML Capital, Ltd. v.

Republic of Argentina,* 1:08-cv-06978-TPG (S.D.N.Y. Feb. 23, 2012), ECF No.

371.  This conclusion, which was embodied in an injunction, was the subject of

two affirmances by this Court—*NML Capital, Ltd. v. Republic of Argentina*, 699

F.3d 246 (2d Cir. 2012) and *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d

---

[2] Plaintiffs declined to accept the exchange offers in 2005 and 2010, as was their
right, since those offers would have yielded only a small percentage of their actual
investments.  A24.

9

230 (2d Cir. 2013), and a Supreme Court denial of certiorari—*Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (2014).

BNY Mellon is an Indenture Trustee under an Indenture Trust Agreement pertaining to some of the Exchange Bondholders, which Agreement had been effectively nullified by the prior judicial orders. A40-41. Despite the judicial orders referred to above, the Republic, on June 29, 2014 (in an effort to avoid a default or at least claim that a default had not taken place), transferred $539 Million to a BNY Mellon bank account located in Argentina and directed that the Funds be paid to a group of Exchange Bondholders who *would* have been entitled on June 30 to payment under the Indenture Trust Agreement *if* the *pari passu* injunction had *not* been entered. A40; A52-55. If the instructions had been followed, many of the monies would have been paid out to Exchange Bondholders who are U.S. residents and/or exchanged their bonds pursuant to a U.S. securities solicitation. *See* Prospectus Supplement dated Dec. 27, 2004, *available at* http://www.sec.gov/Archives/edgar/data/914021/000095012305000302/ y04567e424b5.htm; Prospectus Supplement dated April 13, 2010, *available at* http://www.sec.gov/Archives/edgar/data/914021/ 000090342310000252/roa-424b5_0428.htm; A297-98 ¶¶ 11-12. Absent the required certification that a ratable payment had been made to the holdovers, BNY Mellon sought guidance from the District Court. A38.

10

Not surprisingly, the District Court ordered BNY Mellon not to make the payment to the Exchange Bondholders that had been directed by the Republic. A52-55. Both the District Court and the plaintiffs holding the *pari passu* injunction have stated that the Funds should be returned to the Republic. *See* A506. BNY Mellon has stated that it was willing to do so, provided the Republic give it wiring instructions and the District Court absolve it from liability. *Id*. Ultimately, however, the Funds remained with BNY Mellon, which has its main office in New York, subject to further court orders.

Since the Indenture Trust Agreement was effectively superseded by the *pari passu* injunction and the Funds had been illegally transferred, BNY Mellon has essentially acted as a trustee for a court-sanctioned constructive trust although such a designation has not been officially made. The Republic, in addition to insulting United States courts and urging the Exchange Bondholders to sue its judges (*see* A491; *Argentina tells bondholders to take action against Judge Gresa who is 'withholding funds'*, MERCOPRESS, Oct. 30, 2014, http://en.mercopress.com), has tried to displace BNY Mellon, an effort which has been specifically found to be in in contempt of the *pari passu* injunction. *See* A507.

As mentioned above, the plaintiffs in the first turnover proceeding were a group of judgment creditors who are primarily original Italian bondholders. A second turnover proceeding was brought by a French individual bondholder who is

11

also a judgment creditor.  *See Marie Laurette Dussault v. The Republic of Argentina*, No. 06-CV-13085-TPG (S.D.N.Y. 2014).  Both proceedings were brought pursuant to Rule 69(a) of the Federal Rules of Civil Procedure ("FRCP") and CPLR § 5225(b), which mandates a turnover by a transferee of funds received from the judgment debtor, provided that the creditor's interest exceeds that of the transferee's.

The turnover was opposed by BNY Mellon, the Euro Bondholders and the Republic.  Only the Republic raised the FSIA as a defense, and it incredibly did so after disclaiming any interest in the Funds in a misguided attempt to argue the inapplicability of § 5225(b).  If accepted, the disclaimer means the FSIA does not apply because the Funds are not the property of a foreign sovereign.

After correctly noting that the Funds in question were located outside the United States, the District Court ignored the Republic's ownership disclaimer and implicitly equated a turnover proceeding to an "attachment arrest and execution" proceeding against a foreign sovereign.  It held that that the FSIA does not authorize the institution of such an action with respect to sovereign property located outside the United States despite the District Court's personal jurisdiction over the garnishee.  A521-22.  As discussed further below, no such authorization is needed, even if the Republic's disclaimer is ignored.  The District Court's conclusion otherwise is contrary to the established New York precedent, the

language of the FSIA and the stated rationale of the most recent Supreme Court

opinion concerning such foreign-located sovereign assets.

## SUMMARY OF ARGUMENT

The District Court specifically stated that it was not making any

determination as to whether the Republic of Argentina had any interest in the

Funds which are the subject of the turnover proceeding.  Without making such a

determination, it then held that the Funds, which were located in a foreign bank

account of a New York-based garnishee, were protected from turnover by the

FSIA.

The District Court's approach was clearly erroneous.  It *had* to determine,

as a threshold matter, whether or not the Republic had an interest in the Funds

before determining whether the FSIA applied.  If the Republic did *not* have an

interest, as the Republic itself repeatedly claimed, the FSIA is irrelevant since

there is no foreign sovereign involved in the legal issue presented.  In this

scenario, the District Court's conclusion is as erroneous as its approach, since

New York post-judgment procedures would require a turnover as long as the

interests of the judgment creditors outweigh the interest of the transferee (as they

do).

If the District Court followed the correct approach, it would have had to

determine whether the Republic continued to have an interest in the Funds it had

transferred.  Assuming that the Republic *did* have an interest in the Funds, as the reversionary interest in the underlying agreement as well as its controlling conduct suggests, the District Court's conclusion would still be in error because the FSIA does not apply.

There is no factual dispute that the Funds are located in a foreign account of a New York resident.  By its terms, Section 1609 of the FSIA limits execution immunity to assets "in the United States."  *A fortiori*, the FSIA does not apply. Any doubt on this score should be dispelled by a reading of the Supreme Court's recent *NML* opinion, where the Supreme Court held that the FSIA imposed *no* post-judgment discovery limitation on assets located abroad, specifically because of the "in the United States" wording of Section 1609.

The Republic's "ownership" of the Funds is irrelevant to a CPLR § 5225(b) turnover proceeding because that statutory provision only requires that the judgment debtor (the Republic) transfer the Funds to a third party (BNY Mellon). "Ownership" is only relevant to a FSIA question, and the FSIA only has potential relevance if (i) the Republic retained an interest in the Funds; and (ii) the Funds were deemed to be located in the United States because the New York-based BNY Mellon could admittedly move the Funds.  But if the execution immunity of Section 1609 applied, so too would the immunity exception of Section 1610 since there can be no doubt of either the breadth of the Republic's waiver of execution

immunity or the Funds' "commercial use in the United States." Under this scenario, the District Court's conclusion would also be wrong.

Whatever approach one takes, there should be no question that the plaintiffs are entitled to a turnover since the Funds were transferred by a judgment debtor (the Republic) and the rights of the judgment creditors (Plaintiffs-Appellants) are far greater than that of the rights of the transferee, BNY Mellon. Even if one considers the interest of the Exchange Bondholders for whom the Funds were destined, it is manifest that they are the beneficiaries of transactions which have been held to be illegal by our courts (and under which they have received billions of dollars in benefits). The outcome of any equitable comparison is clear.

The Republic made one final argument: comity. The Republic's conduct does not merit comity. Nor is comity relevant because CPLR § 5225(b) is mandatory. Furthermore, the Republic's comity argument is based upon a statute governing the enforcement of foreign judgments in Argentine courts without any mention of the fact that the Argentine courts are prohibited from enforcing the type of U.S. judgments possessed by the plaintiffs here. The statute does not prohibit (nor could it) a U.S. court from enforcing a U.S. remedy which has extraterritorial reach. When one considers the web of U.S.– based acts that preceded the turnover proceeding and the scope of the Republic's execution waiver, there is no way that the Republic could satisfy the comity precedents established by this Court.

## <u>STATEMENT OF THE STANDARD OF REVIEW</u>

The District Court's decision that the FSIA bars the turnover of foreign sovereign property located outside the United States constitutes a pure issue of law and, therefore, this Court's review of that legal conclusion is *de novo*. *See Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006).

# ARGUMENT

## I. RULE 69(a) OF THE FRCP AND SECTION 5255(b) OF THE CPLR MANDATE TURNOVER OF THE FUNDS

### A. Section 5225(b) of the CPLR May be Utilized by Plaintiffs-Appellants in Aid of Enforcing their Judgments Against the Republic

FRCP 69(a)(1) provides that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located…."

Here, the relevant State law procedure is found in N.Y. CPLR § 5225(b), which provides that:

> Upon a special proceeding[3] commenced by the judgment creditor, against a person in possession or custody of money … in which the judgment debtor has an interest, **or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown** that the judgment debtor is entitled to the possession of such property *or* **that the judgment creditor's rights to the property are superior to those of the transferee**, the court **shall** require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor ....

N.Y. CPLR § 5225(b) (emphasis added).[4]

---

[3] Federal courts have frequently held that a turnover proceeding pursuant to CPLR 5225(b) may be brought by motion under FRCP 69(a). *See S.E.C. v. Colonial Inv. Mngt. LLC*, No. 07 Civ. 8849, 2010 WL 4159276, at *2 (S.D.N.Y. Oct. 6, 2011).

[4] Contrast with CPLR § 5225(a), which requires "that the judgment debtor is in *possession or custody* of money or other personal property in which he has an interest…." (emphasis added).

Courts have long recognized the mandatory nature of CPLR § 5225(b). *See Cardew v. Gialanella*, 92 A.D.3d 1002, 937 N.Y.S.2d 709-10 (3d Dep't. 2012) (recognizing that the "dictates of CPLR 5225(b) are unequivocal*"); accord Samuels v. Samuels*, 99 A.D.2d 986, 986, 473 N.Y.S.2d 436–37 (1st Dep't 1984*); see also* 11 Jack B. WEINSTEIN ET AL., NEW YORK CIVIL PRACTICE ¶ 5225.02 (2d ed.).

It is undisputed that the Republic is a judgment-debtor of Plaintiffs-Appellants. As such, Plaintiffs-Appellants are entitled to utilize CPLR § 5225(b) to assist in enforcing their judgments.

## B. Section 5225(b) Applies Regardless of Whether the Republic has an Interest in the Funds

Regardless of whether the Republic has an interest in the Funds, turnover is warranted under CPLR § 5225(b), which provides that:

> Upon a special proceeding commenced by the judgment creditor, … against a person who is a ***transferee*** of money or other personal property from the judgment debtor, where it is shown … that the judgment creditor's rights to the property are superior to those of the transferee, the court ***shall*** require such person to pay the money, or so much-of it as is sufficient to satisfy the judgment, to the judgment creditor ....

N.Y. CPLR § 5225(b) (emphasis added).

Therefore, under Section 5225(b), turnover is mandatory even if the Republic no longer maintains an interest in the Funds if: (i) the Republic is the transferor of the Funds in question; and (ii) the Plaintiffs-Appellants' rights are

superior to those of the transferee, BNY Mellon.  *See Hotel 71 Mezz Lender, LLC v. Rosenblatt*, 64 A.D.3d 431, 431-32, 883 N.Y.S.2d 30, 30-31 (1st Dep't 2009); *Miller v. Doniger*, 28 A.D.3d 405, 405, 814 N.Y.S.2d 141 (1st Dep't 2006), *Siemens and Halske GmbH v. Gres*, 32 A.D.2d 624, 624, 299 N.Y.S.2d 908, 910-11 (1st Dep't 1969).

It is uncontroverted that BNY Mellon received the Funds from the Republic. Therefore, assuming that the Republic no longer has an interest in the Funds, the only question that remains is whether Plaintiffs-Appellants' rights to the Funds are superior to those of transferee BNY Mellon.  As set forth above, Plaintiffs-Appellants, as judgment creditors of the Republic, have a substantial interest in the Funds.  BNY Mellon, on the other hand, only has a remote interest in the Funds to the extent it becomes necessary for BNY Mellon to turn to the Funds for its fees associated with serving as the indenture trustee.  Significantly, Plaintiffs-Appellants have clearly indicated a willingness to waive any challenges to BNY Mellon's fees, which could only conceivably constitute a small portion of the Funds.[5]  *See* A508-09.

---

[5] To the extent that BNY Mellon is concerned about potential liability, it is difficult to believe that any judicial proceeding would find BNY Mellon to be liable for the "wrong" of complying with the District Court's orders.  However, in order to protect against that remote possibility, Plaintiffs-Appellants have also agreed to the express inclusion of liability protection in a manner similar to the District Court's August 6 Order.  A509 at n.7.

With regards to the Euro Bondholders – they do not have standing here. The determination to be made under CPLR § 5225(b) is which entity has a superior claim to the funds *as between the transferee and the judgment creditor*. CPLR § 5225(b) makes no reference to third parties who may also assert a claim to the funds. Regardless, as between bondholder groups, equitable considerations weigh heavily in favor of the Italian Judgment Creditors over the Euro Bondholders. The "rights" of the Exchange Bondholders were created by Exchanges held to be illegal because they violated the rights of the holdover bondholders. While the Euro Bondholders whine that they may miss the most recent interest payment owed on their bonds if the funds are subject to turnover, the Italian Judgment Creditors who are original buyers at face value, *have not received any principal or interest payments on their bonds since 2001*. Meanwhile, the Euro Bondholders have benefited to the tune of billions of dollars during the years that the illegal agreements were allowed to operate. A turnover would effectively (and belatedly) redirect payment from a group of favored beneficiaries to another group of ignored beneficiaries, without voiding anyone's claim against the recalcitrant Republic. Any other result would perpetuate the Republic's long-term practice of illegally honoring some obligations while ignoring others in cavalier disregard of its contractual obligations.

### C. Section 5225(b) Applies Even if the Republic Maintained an Interest in the Funds

If, contrary to the Republic's assertions (*see infra* pp. 25-27), the Republic is found to have maintained an interest in the funds held by BNY Mellon, CPLR § 5225(b) provides in the alternative that:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money … ***in which the judgment debtor has an interest***, **…** where it is shown that the judgment debtor is entitled to the possession of such property **…** the court ***shall*** require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor ....

CPLR § 5225(b) (emphasis added).

Even though the Republic has disclaimed an interest in the funds, it has attempted to exercise control over the funds by seeking to supplant BNY Mellon as Trustee and directing BNY Mellon to ignore the August 6 Order and "stand ready to assign, transfer and deliver, to the successor trustee to be appointed in its place, all property and monies currently held by it…,"— the instruction which led to a citation of contempt by the District Court on September 29. A485-87. This outrageous conduct was followed by transferring another $161 Million to a self-declared "Successor Trustee" on September 30, purportedly supplanting BNY Mellon for obeying the District Court's Order. A489. The District Court found these latter actions to be a specific attempt to circumvent the District Court's prior holdings that needed to be undone. *See* Order, *NML Capital, Ltd. v. The Republic*

21

*of Argentina*, 1:08-cv-06978-TPG (S.D.N.Y. Oct. 3, 2014), ECF No. 693.

Finally, Section 11.3 and Section 11.4 of the Trust Indenture Agreement, which the Republic argues is controlling over the funds, make clear that the Republic retains a reversionary interest in any funds not paid to the Exchange Bondholders.  A213.  Clearly such a reversionary interest is a property interest, as has been previously held with respect to the Brady Bonds.  *See Capital Ventures Intern. v. Republic of Argentina*, 443 F.3d 214, 220 n.4 (2d Cir. 2006); *Capital Ventures Intern. v. Republic of Argentina*, 652 F.3d 266, 270 (2d Cir. 2011).

The simple fact is that a turnover proceeding under CPLR § 5225(b) is warranted, whether or not the Republic has successfully disclaimed its interest in the Funds.

### D.    Section 5225(b) Applies to Property Located Overseas

While CPLR § 5225(b) clearly applies to funds located in the United States, the New York Court of Appeals has also held that turnover is mandated even when the subject property is located overseas as long as the person controlling the property is subject to personal jurisdiction in New York.  *See Koehler v. Bank of Bermuda Ltd.*, 883 N.Y.S.2d 763, 911 N.E.2d 825, 829 (N.Y. 2009) (answering question certified by *Koehler v. Bank of Bermuda Ltd.*, 544 F.3d 78 (2d Cir. 2008)) ("CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires a garnishee to transfer money or property into New

22

York from another state or country .... We hold that a New York court with
personal jurisdiction over a defendant may order him to turn over out-of-state
property regardless of whether the defendant is a judgment debtor or a
garnishee."); *see also JW Oilfield Equip., LLC v. Commerzbank, AG*, 764 F. Supp.
2d 587, 596 (S.D.N.Y. 2011) (ordering bank to turnover judgment debtor's funds
located in foreign bank account); *Calton v. Pressler & Pressler, LLP*,  No. 10 Civ.
2117(LMM), 2011 WL 10901795, at *2 (S.D.N.Y. Aug. 23, 2011) (upholding
restraint of out-of-state bank accounts based on decision in *Koehler*); *Gryphon
Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 41 A.D.3d 25, 836 N.Y.S.2d 4, 5 (1st
Dep't 2007), *lv. denied,* 10 N.Y.3d 705 (N.Y. 2008) (reversing lower court's order
that a turnover order cannot reach property outside New York); *Abuhamda v.
Abuhamda*, 236 A.D.2d 290, 654 N.Y.S.2d 11, 11–12 (1st Dep't 1997) (holding
that a New York court can order the restraint of property located in bank account
held outside of New York).

 This is consistent with orders directing judgment debtors to turnover
property located out-of-state pursuant to CPLR § 5225(a).  *See Miller*, 28 A.D.3d
at 405 (directing turnover of funds to judgment creditor held in out-of-state bank
account pursuant to CPLR § 5225(a)); *see also Gryphon Dom. VI, LLC*, 41 A.D.3d
at 31; *Starbare II Partners, L.P. v. Sloan*, 216 A.D.2d 238, 239, 629 N.Y.S.2d 23,
23 (1st Dep't 1995); *Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*, No. 10 Civ.

6147(PAC), 2014 WL 81563, at *2 (S.D.N.Y. Jan. 9, 2014) (granting turnover order pursuant to CPLR § 5225(a) of judgment debtor's out-of-state assets in order to satisfy judgment); *CIMC Raffles Offshore (Singapore) Pte. Ltd. v. Schahin Holding S.A.*, No. 13 Civ. 52(JSR), 2013 WL 4082973, at *1 (S.D.N.Y. Aug. 6, 2013) (same); *S.E.C. v. Softpoint, Inc.*, No. 95 Civ. 2951, 2012 WL 1681167, at *3 (S.D.N.Y. May 9, 2012) (ordering creditor to relinquish interest in money held in Canada to the SEC pursuant to CPLR § 5225(a)).

Therefore, Section 5225(b) clearly mandates the turnover of the funds even were this Court to find that the funds are located outside the U.S., as long as BNY Mellon is subject to the personal jurisdiction of the District Court, which it is. The question becomes one of whether there is any other reason why the normal turnover should not have been ordered. The court below believed the FSIA prohibited a turnover; for various reasons, it does not.

## II.   THE FSIA DOES NOT BAR THE TURNOVER OF THE FUNDS

### A.   The FSIA Simply Does Not Apply if the Republic No Longer Has a Property Interest in the Funds.

Section 1609 of the FSIA confers execution immunity on "the property in the United States of a foreign state." Whether or not "in the United States" means exactly that, as we argued below, or worldwide, as the District Court seems to believe, it is incontrovertible that the immunity applies only to "the property . . . .

24

of a foreign state." 28 U.S.C. § 1609. Put another way, there is no execution immunity for property that does not belong to "a foreign state."

In its opposition, vigorously joined by BNY Mellon and the Euro Bondholders, the Republic several times emphatically disclaimed an interest in the funds. *See* A468, 471, 473. Even the Republic's brief below is entitled: "Memorandum of the Republic of Argentina in Opposition to Plaintiffs' Motions to Execute[sic] *on Exchange Bondholder Property* Located in Argentina". A459 (emphasis added).

If one accepts the Republic's disclaimers (which were made in a misguided attempt to evade § 5225(b)), the FSIA does not apply because the property in question does not belong to "a foreign state", but is subject to turnover under CPLR § 5225(b) without any further ado.[6] This makes it clear that the District Court needed to address the ownership question *before* it reached the FSIA question since the FSIA question would be meaningless if the property no longer belonged to the Republic.

This is not what the District Court did. It expressly skipped the question of whether "the Republic has an interest in the funds" before deciding that the turnover was not authorized by the FSIA. Since this latter question is a moot

---

[6] The Republic made its FSIA argument *only* as an alternative argument in the event that the court below decided the property question contrary to its disclaimers. *See* A475.

question if the Republic had no interest, as it claimed, the failure to address the

threshold question is plain error.

**B.** **If the Republic has a Continuing Property Interest in the Funds, the FSIA Does Not Apply Because the Funds are Located Outside the United States**

### (a) *Legislative Overview of the FSIA*

The Supreme Court's recent opinion in *Republic of Argentina v. NML Capital Ltd.*, 134 S. Ct. 2250 (2014), which concerned foreign-located sovereign assets, traced the history of foreign sovereign immunity in the United States. Prior to 1952, the determination of whether to request immunity was made by the Executive Branch, which typically requested immunity in all suits involving friendly foreign states. *Id*. at 2255. In 1952, the State Department endorsed a much narrower version of immunity and limited such immunity to a foreign sovereign's public non-commercial activities. *Id*. The application of the narrower version involved two different branches of governments and led to inconsistent results—a state of affairs that the Court characterized as "bedlam." *Id*.

The FSIA was passed in 1976, and was intended to provide a more streamlined way to address claims of immunity by foreign states. *Id*. Determination was left solely to the judiciary, which was to decide immunity claims pursuant to standards set out in the FSIA insofar as they applied.

The very first provision of the FSIA is 28 U.S.C. § 1602, entitled "Findings and declaration of purpose". The first "finding" is that a judicial determination of a foreign immunity claim would both "serve the interests of justice" and "protect the rights of both foreign states and litigants in United States courts." 28 U.S.C. § 1602. The shift to judicial determination and away from administrative discretion cannot be more clear. Equally clear are the concepts that such judicial determinations should consider both the needs of the sovereign and the involved litigants, not favor one over another, and should bear in mind the service of "the interests of justice". *Id*.

The second "finding" concerns international law: "Sovereigns are not immune from jurisdiction … insofar as their commercial activities are concerned and their commercial property may be levied upon for the satisfaction of judgments…." *Id*. Nothing in this finding restricts the commercial activities to activities in the United States or the commercial property to property located in the United States. Hence, the inference that the courts of the United States can address extraterritorial activities and properties where appropriate is unmistakable.

The next provision, 28 U.S.C. § 1603, is a definitional one. Notably, Section 1603 contains a broad definition of "commercial activity" (*see* 28 U.S.C. § 1603(d)), and a separate definition of "commercial activity in the United States."

*Id*.  The Congress' perceived need to have separate definitions in (d) and (e) strongly suggests that a distinction was intended.

The immediately following sections, 28 U.S.C. §§ 1604 and 1605 set forth the basic rule of jurisdictional immunity, and the exceptions thereto (28 U.S.C. § 1605), including waiver of jurisdictional immunity.  *See* 28 U.S.C. § 1605(a)(1). Of particular significance here is 28 U.S.C. § 1605(a)(2), which makes exceptions for (i) acts performed in the United States but related to the commercial activity of the foreign state elsewhere; and (ii) acts committed "outside the territory of the United States" but having an effect in the United States.  *Id*.  Under either of these exceptions, the need for extraterritorial reach is palpable: the relationship between the act and the commercial activity is essential for a judicial determination of a claim of jurisdictional immunity.

The next section, 28 U.S.C. § 1606, states that if the foreign state is not immune from jurisdiction, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  It hardly takes a flight of imagination to conclude this liability extends to post-judgment collection efforts of a judgment creditor.  Nonetheless, Argentina argues that the placement of the language in the statutory scheme suggests that the provision only applies to jurisdictional immunity.  Argentina's reasoning renders judgments of U.S. courts

against foreign states meaningless, for what good is establishing someone's liability without the ability to conduct post-judgment proceedings.

Next, 28 U.S.C. § 1609 sets forth the basic rule of "Immunity from attachment and execution of property of a foreign state" *i.e.*, that the property of foreign states in the United States is immune from the particular enumerated post-judgment remedies of "attachment arrest and execution" with the exceptions set forth in the trailing statutory provisions. This choice of language strongly suggests that other non-enumerated post-judgment remedies are available, wherever the property is located, but that the enumerated remedies are left to the applicable law of the nation in which the property is located. Notably, 28 U.S.C. § 1609 says nothing about property located outside the United States.

The exceptions to this circumscribed execution immunity are set forth in 28 U.S.C. §§ 1610 and 1611. Significantly, there is no mention of post-judgment remedies other than attachment and execution in either Section 1610 or 1611, except insofar as the arrest of "vessels of a foreign state" is concerned. *See* 28 U.S.C. § 1610(e). Nor is there any mention of discovery or "supplemental proceedings." Nor do either of the provisions address property outside the United States. The inference is that post-judgment remedies other than attachment, execution and arrest can be used against property in the United States and all post-

judgment remedies in accordance with applicable law can be utilized with respect to commercial property located outside the United States.

### (b)     The FSIA Does Not Prohibit Post-Judgment Collection Efforts Against Sovereign Assets Located Outside the United States

Although the Act was intended to be "comprehensive," it did not provide an answer to all questions.  In *EM Ltd.*, for example, this Court grappled with the question of post-judgment discovery of foreign sovereign assets when neither discovery nor supplemental proceedings in aid of judgment collection received any real mention in the Act.  *EM Ltd.*, 695 F.3d at 208-09.  As it did in *EM Ltd.*, the Republic argues that the Act's silence means that such discovery or supplemental proceedings are unauthorized.  But as the Supreme Court found, silence merely means that otherwise appropriate conduct is not prohibited by the Act, as a close reading of the Act would indicate.

The silence regarding post-judgment remedies pertaining to foreign-located sovereign assets in the FSIA should not be read as an open invitation to place judicial restrictions on long-standing federal and state powers, and the use of equitable powers.  Rather, the FSIA should only be found to impose such a restriction if the restriction can explicitly be found within the text of the statute itself.  *See Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1267 (2011) (courts cannot construe a statute in a way that has "no basis or referent in [the statute's] language"); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010) (courts

cannot interpret a statute in such a way that has "no basis whatever in the text . . . .").

Circling back to the purposes expressed in Section 1602, Argentina has unequivocally waived not only jurisdictional immunity but also "consents generally for the purposes of the [FSIA] to the giving of any relief . . . in connection with any Related Proceeding or Related Judgment" with the exception of certain specific property (*i.e.*, reserves, and public property located in Argentina).  *NML Capital, Ltd.*, 134 S. Ct. at 2253 n.1.  For more than a decade, Argentina has denied the plain meaning of its waivers, which obviously support the post-judgment remedy sought here.  Whether judicial endorsement of this denial "serves the interests of justice" or the "needs of the litigants" are issues fairly considered in any analysis under the FSIA.

With legislative overview of the FSIA in mind, the Supreme Court's *NML Capital* opinion comes into clearer focus.  In affirming the District Court opinion, this Court rested its decision on two pillars: (i) that the discovery sought did not operate as an "arrest attachment or execution" and therefore was not prohibited; and (ii) that the discovery sought was of two banking institutions who could not claim immunity.  *See EM Ltd.*, 695 F.3d at 209-10.  This Court specifically reserved on the question of whether sovereign assets located abroad could be the subject of a post-judgment collection effort.  *Id*. at 208.

The Supreme Court's *NML Capital* opinion reached the same result as this Court did, but utilized a vastly different approach. First, the Court noted the scant mention of discovery in the FSIA, and observed that "Argentina would have us draw meaning from the silence." *NML Capital, Ltd.*, 134 S. Ct. at 2257. The meaning drawn by the Court was quite different from the one intended by Argentina - - the lack of a "plain statement" necessary to preclude federal discovery rules meant that the normal rules should apply.

The Republic also argued that the foreign-state property, wherever located, was accorded absolute execution immunity prior to the passage of the FSIA, and that the lowering of the absolute barriers in §§ 1610 and 1611 with respect to property in the United States meant that foreign-located property continued to enjoy execution immunity and therefore should not be discoverable. After noting a lack of precedent supporting Argentina's "historical view", this argument was specifically rejected because § 1609 *only* accorded execution immunity to foreign sovereign assets located in the United States:

> "More importantly, even if Argentina were right about the scope of the common-law execution-immunity rule, then it would be obvious that the terms of § 1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property '*in the United States*.'" *Id.* at 2257 (emphasis in original).

Given both the language of the Act and the Supreme Court's *NML Capital* opinion, it is clear that the District Court was wrong in ruling that the FSIA

effectively prohibits post-judgment collection efforts against foreign-located sovereign assets by not specifically authorizing such efforts. Since no authorization for discovery of such assets is necessary, no FSIA authorization is needed for a post-judgment creditor to pursue post-judgment remedies authorized by Rule 69 and relevant state law. Put another way, Rule 69 defers to a federal statute that applies, and the Supreme Court has said that the FSIA does not accord execution immunity to foreign-sovereign assets located outside the United States. *A fortiori*, the FSIA does not restrict the use of post-judgment remedies authorized by Rule 69.

### C. If the Funds are Deemed to be Located in the U.S., the Execution Immunity Exception of § 1610(a)(1) to the FSIA Would Apply

The funds in question are located at a BNY Mellon bank account in Argentina, but BNY Mellon has control of the funds and has stated that it can transfer the funds at will. *See* A38. This being so, this Court could arguably deem the funds to be located here in New York where BNY Mellon is located. Assuming this Court decided to do so, the question then becomes one of the FSIA's application in that circumstance.

This analysis would necessarily begin with a study of the statutory language as it pertains to execution immunity. Execution immunity is conferred by § 1609, which addresses only "attachment, execution and arrest." No mention of a turnover motion is made, despite the fact that such motions were employed by the

several U.S. Courts long before the 1976 passage of the FSIA. *See, e.g., Ivor B. Clark Co. v. Hogan*, 296 F. Supp. 398, 405-06 (S.D.N.Y. 1968) (ordering future rent on property owned by debtor to be paid over to creditor pursuant to CPLR § 5225(b)), *order modified*, 296 F. Supp. 407 (S.D.N.Y. 1969); *Glenmore Distilleries Co. v. Seideman*, 267 F. Supp. 915, 916 (E.D.N.Y. 1967) (granting motion by judgment creditor seeking turnover of moneys that a judgment creditor transferred to a third-party pursuant to FRCP 69(a) and CPLR § 5225(b)).

Moreover, long before the FRCP or the CPLR, our federal courts were recognized to have equitable powers arising out of the pre-Revolution powers of the English Chancery courts. *See, e.g.,* Brent McKnight, *How Shall We Then Reason – The Historical Setting of Equity*, 45 Mercer L. Rev. 919, 927-35 (1994). Those powers were used as appropriate, including efforts to aid judgment creditors in collecting on judgments rendered by the courts. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934) (it is well settled that "[A] federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein . . . ."). The use of those powers enhanced the perception of justice and fairness our courts have, and did much to preserve a judicial dignity that would have been eroded if there was a perception that our courts were unable or unwilling to enforce the judgments they reached.

Under the canons of statutory interpretation, as reflected in the Supreme Court's *NML* opinion, the failure to mention turnovers in §1609 would mean that the FSIA does not apply and that any such proceeding would be governed by the turnover law of the State in which the federal district court sits.

Even if one concludes that §1609 does apply, §1610(a)(1) creates an execution immunity exception for this circumstance, since the Republic has clearly "waived its immunity from attachment" in very explicit language pertaining to the FSIA and the funds in question were to be "used for a commercial activity in the United States."

As to waiver, the operative language is as follows:

> "To the extent that [the Republic] or any of its revenues, assets or properties shall be entitled ... to any immunity from suit ... from attachment prior to judgment ... from execution of a judgment or from any other legal or judicial process or remedy, ... [the Republic] has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (and consents generally for the purposes of the [FSIA] to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment)...."

*NML*, 134 S. Ct. at 2253, n.1.

As to the use, the Republic sent the funds to BNY Mellon for the purpose of paying interest on the exchange bonds. These exchange bonds are the product of exchange offer solicitations that were made in the U.S. pursuant to U.S. securities laws. Many of the bondholders who accepted the exchange offers are U.S.

35

residents and much of the funds are to be passed to them through various U.S. intermediaries. Notably, the exchanges themselves are violations of the *pari passu* clause under an agreement governed by New York law, as this Court has held.

The Supreme Court decision in *Republic of Argentina v. Weltover* is particularly relevant to the determination of whether the Republic's transfer of funds to BNY Mellon constituted "commercial activity" in the United States within the meaning of the Section 1610(a)(1) exception. 504 U.S. 607 (1992). In *Weltover*, the Supreme Court analyzed whether the Republic was engaged in "commercial activity" as defined by the FSIA when the Republic issued, and continued to be liable under, government bonds to creditors, called "Bonods." *Id*. at 609. In making that determination, the Supreme Court concluded that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning the of the FSIA." *Id*. at 614; *see also NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 258 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 273 (2012) ("To determine the nature of a sovereign's act, we ask 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce.'") (*quoting Anglo–Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 177 (2d Cir. 2010)).

36

Applying this standard to the Bonods, the Supreme Court found that they constituted commercial activity in the United States by the Republic because "they are in almost all respects garden variety debt instruments:  They may be held by private parties; they are negotiable and may be traded on the international market (except in Argentina); and they promise a future stream of cash income." *Weltover*, 504 U.S. at 615; *see also Mortimer Off Shore Services, Ltd. v. Federal Republic of Germany*, 615 F.3d 97, 107 (2d Cir. 2010) (holding that the commercial activity exception to the FSIA applied to the Federal Republic of Germany ("FRG") because "[b]y allegedly assuming obligations under the Bonds, the FRG, like Argentina in *Weltover*, engaged in activity routinely undertaken by private parties"); *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 53 (2d Cir. 2002) (finding that state bank of Iraq engaged in commercial activity within the meaning of the FSIA by participating "in commercial banking transactions in the United States"); *World Holdings, LLC v. Federal Republic of Germany*, 613 F.3d 1310, 1315 (11th Cir. 2010) (holding that the "issuance and sale of bonds in the United States brings [Germany] within the commercial-activity exception to the FSIA's grant of immunity.").  Similarly, the sale and exchange of bonds, and paying interest thereon, are commercial activities.

Here, the original solicitations were made in the United States pursuant to U.S. securities laws.  *See* Prospectus Supplement dated Dec. 27, 2004, *available at*

http://www.sec.gov/Archives/edgar/data/914021/000095012305000302/

y04567e424b5.htm; Prospectus Supplement dated April 13, 2010, *available at*

http://www.sec.gov/Archives/edgar/data/914021/000090342310000252/roa-

424b5_0428.htm.  The exchange solicitations were made in the United States

pursuant to U.S. securities laws.  *Id*.  Many of the Exchange Bondholders to be

paid are U.S. residents and/or hold exchange bonds denominated in U.S. dollars.

Payments are often made through U.S. intermediaries, such as BNY Mellon here.

*See* A297-98 ¶¶ 11-12.  Clearly, under *Weltover*, the Republic has engaged in a

commercial activity occurring in the United States.  As a result, the execution

exception to the FSIA should apply if the funds are deemed to be located in the

United States.

## III.  RULES OF INTERNATIONAL COMITY DO NOT BAR POST JUDGMENT EXTRA-TERRITORIAL COLLECTION EFFORTS AGAINST THE REPUBLIC

Obviously, a judgment creditor can seek to have a U.S.  judgment enforced

in a foreign jurisdiction, and the judgment will normally be enforced pursuant to

international conventions absent truly extraordinary circumstances.  This normal

avenue is completely closed here, because Argentina has passed legislation which

absolutely precludes its courts from even considering the enforcement of U.S.

judgments in any matter relating to Argentina's bond default.  *See NML Capital,*

*Ltd.*, 699 F.3d at 254, 260, 262.  Thus, plaintiffs must seek other means to enforce the judgments of the federal courts.

Rule 69 specifically directs that a federal court is to follow the post-judgment remedies afforded by the laws of the State in which the court sits.  And CPLR § 5225 specifically permits a turnover proceeding by a judgment creditor against a judgment debtor (§ 5225(a)) and a turnover proceeding against a garnishee who either holds the funds of a judgment debtor or receives funds from a judgment debtor (§ 5225(b)).  As discussed previously, these post-judgment remedies have been commonly employed against assets held outside the United States, as long as the Court had personal jurisdiction over the judgment debtor or the transferee.  *See supra* pp. 22-24.  Were it not for the fact that the judgment debtor here is a sovereign, there would be no further room for discussion.

Furthermore, there is no other question about the application of CPLR § 5225(b), which is written in mandatory terms.  *See supra* pp. 18-24.  Assuming, however, that this Court should consider other factors because of the Republic's sovereignty, the first focus should be on Argentina's waivers of sovereign immunity, both as to jurisdiction and execution.  The first waiver is an absolute waiver of jurisdictional immunity under the FSIA, accompanied by the acceptance of New York law as the governing rule of decision.  Thus, the Republic is, as the Supreme Court observed, "liable in the same manner and to the same extent as

39

private individual under like circumstances." 28 U.S.C. § 1606; *NML Capital,*

*Ltd.*, 134 S. Ct. at 2256. In other words, the assets of the Republic here should be

accorded the same treatment as the assets of the judgment debtor in *Koehler*. *See*

*Koehler*, 883 N.Y.S.2d 763.

Any misgivings about the application of Section 1606 can be resolved by

reading the Republic's waiver of execution immunity, which is *unlimited* as to

forum or proceeding:

> "To the extent that [the Republic] or any of its revenues, assets
> or properties shall be entitled ... to any immunity from suit ...
> from attachment prior to judgment ... from execution of a
> judgment or from any other legal or judicial process or remedy,
> ... [the Republic] has irrevocably agreed not to claim and has
> irrevocably waived such immunity to the fullest extent
> permitted by the laws of such jurisdiction (and consents
> generally for the purposes of the [FSIA] to the giving of
> any relief or the issue of any process in connection with any
> Related Proceeding or Related Judgment)...."

*NML Capital, Ltd.*, 134 S. Ct. at 2253 n.1 (emphasis added)

The only execution immunity *possibly* reserved is where the *forum*

jurisdiction (*i.e.*, New York) limits the scope of the waiver ("to the fullest extent

permitted by the laws of such jurisdiction"). In this forum, which is the only one

applicable, there are no restrictions with respect to the scope of execution

immunity except those imposed by the FSIA. With regard to the FSIA, the waiver

is complete unless it pertains to Argentina's reserves or its public

property—two exceptions which do not apply here.  Under either New York or federal law, the waiver of execution immunity is as complete as it can be.

In the court below, Argentina argued that the law of Argentina precluded the relief sought, but the only law it specified was one in which Argentina courts are given permission to enforce foreign judgments.  *See* A474.  Such a statute obviously does not preclude alternative means of enforcing a judgment, such as the turnover sought here.  *See* A512.  The Republic also loses sight of the irony in citing such a statute when it knows its laws prohibit its courts from enforcing judgments related to the bond default.  *Id*. at n.9.  Moreover, the Republic's ownership disclaimer (*see supra* pp. 24-26) has further eviscerated the vitality of this argument.

The Republic's other argument below was that U.S. courts should not order a turnover because to do so would offend international comity.  The irony is overwhelming.  The  Republic has ignored the judgments of our courts, it has sought to undermine their authority, it has been held in contempt for its conduct, it has insulted our judiciary, and it has urged the Exchange Bondholders to sue our judges.  *See* A507.  The Republic has even lied to the Supreme Court of the United States, saying it would honor U.S. judgments when it had no intention of doing so. *See* Oral Argument at 14:20-15:4, *Aurelius Capital Master, Ltd. v. Republic of Argentina*, No. 14-2689 (2d Cir. Sept. 18, 2014).  Surely, one who would have

comity must <u>do</u> comity.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d

Cir. 2004) ("It is also well established, however, that orders of foreign courts are

not entitled to comity if the litigants who procure them have 'deliberately courted

legal impediments' to the enforcement of a federal court's orders"); *Societe*

*Internationale v. Rogers,* 357 U.S. 197, 208–09 (1958); *Laker Airways Ltd. v.*

*Sabena*, 731 F.2d 909, 939–40 (D.C. Cir. 1984) (refusing to respect English court's

order where the "defendants involved in the American suit had ... gone into the

English courts to generate interference with the American courts"); *China Trade &*

*Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36–37 (2d Cir. 1987) (citing *Laker*

*Airways* with approval).

Further, at least according to Argentina, the funds do not belong to

Argentina.  They supposedly are the property of the Exchange Bondholders.

Surely, our courts can determine, pursuant to §5225(b), whether the claims of

judgment creditors are superior to those of rival claimants without resorting to

considerations of international comity when our courts have jurisdiction over the

issue through their personal jurisdiction over the garnishee.

This Court's recent opinion in *Gucci Am., Inc. v. Weixing Li* cited Section

403 of the Restatement (Third) of Foreign Relations Law as a useful form of

analysis when the possibility of the infringement of sovereign rights exists.  768

F.3d 122, 139 n.20 (2d Cir. 2014).  Assuming such possible infringement exists

here (and we do not believe that it does because of the Republic's disclaimers), the bottom-line question under that analysis is whether the exercise of jurisdiction "is unreasonable." *Id*. Given the scope of the Republic's waivers, its contumacious conduct, and its inability to cite a clear legislative prohibition with respect to the remedy sought, the exercise of post-judgment jurisdiction by U.S. courts cannot be thought "unreasonable." *See JW Oilfield Equip., LLC,* 764 F. Supp. 2d at 597-98 ("[Judgment debtor] affirmatively availed itself of the jurisdiction of the United States Court for the Western District of Oklahoma, but now has flouted lawful orders of the Oklahoma Court requiring a Judgment Debtor Exam. The United States has a strong interest in enforcing its judgments, especially against those who affirmatively avail themselves of its courts and then attempt to avoid the consequences").

Further, the only link to Argentina is that the Republic, which has agreed to the jurisdiction of U.S. courts, has made a payment in Argentina to BNY Mellon, which is also subject to the jurisdiction of the U.S. courts. The payment was to be transferred to a group of Exchange Bondholders, many of whom were solicited to invest in the U.S. pursuant to documents required to comply with U.S. securities laws. A good number of these Exchange Bondholders are U.S. residents. The turnover proceeding is brought by U.S. judgment creditors, who made their original investment pursuant to documents governed by New York law. Having

used the guarantees of U.S. law and U.S. courts to conduct successful fund solicitations pursuant to U.S. securities laws, it ill behooves Argentina to now argue that international comity requires the application of Argentine law whether or not it has disclaimed an interest in the funds.

## CONCLUSION

The Republic took a calculated risk when it transferred the Funds so that it could argue that it had not defaulted on its obligations to Exchange Bondholders. The Republic had to know that the District Court would not condone an obliteration of its *pari passu* injunction, and the risk deemed to be worth taking was the disposition of the Funds. The Republic may have assumed that the Funds would be returned to it, and it did not count on the District Court's freezing of the Funds which exposed the Republic to a turnover proceeding. When confronted, the Republic disclaimed an interest in the Funds on the mistaken notion that a disclaimer would defeat a turnover proceeding. Having taken a tactical risk and having made an a legal error, the Republic has exposed the Funds to the rightful claims of judgment creditors and there is no reason why those rightful claims, held so long in abeyance, should be denied.

The District Court's order issued on October 27, 2014, denying Plaintiffs-Appellants' motion for a turnover order, should be reversed and vacated and this Court should mandate the turnover of funds to Plaintiffs-Appellants.

Dated:  December 22, 2014
      New York, New York

           Respectfully submitted,

           DUANE MORRIS LLP

           By: s/ Anthony J. Costantini
           Anthony J. Costantini
           Suzan Jo
           1540 Broadway
           New York, NY 10036
           Tel: (212) 692-1000
           ajcostantini@duanemorris.com

           *Attorneys for Plaintiffs-Appellants*
           *Allen Applestein TTEE FBO*
           *D.C.A.Grantor Trust, et al.*

## CERTIFICATE OF COMPLIANCE

I, Suzan Jo, Esq., hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,940 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), according to the word count of the word processing system used to prepare this brief.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Dated:   December 22, 2014

Respectfully submitted,

DUANE MORRIS LLP

By: s/ Suzan Jo
Suzan Jo
1540 Broadway
New York, NY 10036
Tel: (212) 692-1000
sjo@duanemorris.com

46